UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Eastern Division                                                  Case No. _____

| | |
|---|---|
| RENÉE ELLIS,[1] ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| NORTH ANDOVER PUBLIC SCHOOLS, ) | |
|     Defendant. ) | |

# Complaint and Demand for Jury Trial

### INTRODUCTION

Plaintiff Renée Ellis ("Ms. Ellis") brings claims for disability discrimination based on failure to accommodate and termination in violation of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101 *et seq*. and M.G.L. c. 151B, §§ 4(4A) & 4(16). Ms. Ellis's claims arise out of acts of her former employer, Defendant North Andover Public Schools ("NAPS" or "Defendant") when it failed to provide her with a reasonable accommodation for her disability and terminated her because of her disability.

### PARTIES

1. Plaintiff Renée Ellis is an adult resident of the Commonwealth of Massachusetts, who resides at 359 North Street, Georgetown, Essex County, MA 01833.

2. Defendant North Andover Public Schools is a Massachusetts quasi-municipal corporation with a principal office located at 566 Main Street, North Andover, Essex County, MA 01845.

---

[1] In 2018, Renée Ellis changed her legal name from her married name of Renée Thomson to her maiden name of Renée Ellis. This federal court Complaint uses her legal name of Ellis, whereas the MCAD Charge and all the documentation refer to her by her married name of Thomson.

**JURISDICTION**

3. Plaintiff timely filed her claims with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"). Plaintiff removed her claims from the MCAD and received right to sue letters from the EEOC and MCAD in order to file her claims in Federal Court.

4. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 based on a federal question over the claims raised under 42 U.S.C. § 12101 *et seq.* and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims raised under M.G.L. c. 151B.

**FACTUAL ALLEGATIONS**

5. Ms. Ellis was diagnosed with gestational diabetes when she was pregnant with both of her daughters, who were born in 1990 and 1993 respectively. Approximately five years after her second daughter was born, Ms. Ellis was diagnosed with Type 2 diabetes. Her doctor put her on a medication called Metformin to control her high blood sugar.

6. In September 2000, Ms. Ellis was hired as a Special Education Teacher Aide at the Sargent Elementary School in the North Andover Public Schools.

7. Ms. Ellis was re-hired as a Teacher Aide at the Sargent Elementary School for the 2001-02 school year.

8. Ms. Ellis was re-hired as a Special Education Aide at the Franklin Elementary School in the North Andover Public Schools for the 2002-03 school year.

9. Ms. Ellis was re-hired as a temporary aide in the Copy Room at North Andover High School at the beginning of the 2003-04 school year. In November 2003, she was employed as a Special Needs Teacher Aide at the North Andover Middle School.

10. Ms. Ellis continued to be employed at the North Andover Middle School as a Special Needs Teacher Aide through the end of the 2015-16 school year.

11. Ms. Ellis was evaluated three times while she was employed with the North Andover Public Schools.  Her first evaluation was on March 31, 2003 when she was at the Franklin School.  She was rated by Pamela Lathrop as "Satisfactory," the highest available rating in 13 of 13 categories.  Ms. Ellis's second evaluation was on June 24, 2008 after she transferred to the North Andover Middle School.  She was rated by Kate Noonan who gave her a check mark in 13 of 13 categories, indicating satisfactory performance, without any suggestions for improvement.  Ms. Ellis's third evaluation was on June 21, 2010 by Principal Joan McQuade.  She was rated as "Satisfactory," the highest available rating in 13 of 13 categories.

12. For approximately five years, from the 2010-11 school year to the 2014-15 school year, Ms. Ellis was assigned as a Special Needs Teacher Aide (sometimes referred to as a Special Education Assistant) to the special education class of Aaron Drosdek who was a Special Education Teacher with sixth, seventh and eighth grade special education students in one classroom.  Ms. Ellis was assigned to his sixth grade students, who numbered between one and four special education students who were all on Strict Individualized Education Plans (IEPs) for intellectually challenged students.  Ms. Ellis supported those students by helping to implement their IEPs, assisting those students with physical and medical needs, and working with the classroom teacher and any specialists to support the students.

13. In 2011, Ms. Ellis began to experience some vision problems that were related to her diabetes.  She sought medical care including having surgery on her left eye in 2013,

which was successful in stopping the bleeding that was occurring as a result of diabetic retinopathy that causes blood vessels in the retina of the eye to leak. She also began having injection therapy to address the blood vessel issues in her eyes. Because of her vision problems, Ms. Ellis began having difficulty reading fine print. She sought assistance from Mr. Drosdeck who provided photocopies of written assignments with enlarged text. Ms. Ellis purchased a hand-held magnifying glass to assist her.

14. During the 2014-15 school year, Ms. Ellis had surgery on her right eye. Unfortunately, the surgery was not successful but indeed made the issues, including the bleeding of the right eye, even worse. She took a leave of absence for several months in order to recover from the surgery. Ms. Ellis was not required to undergo a fitness for duty exam to return from her medical leave.

15. On the first day of school in September 2015, Ms. Ellis attended a meeting with other teachers and Principal McQuade to discuss back to school issues. Ms. Ellis assumed that she would be placed back in Mr. Drosdek's classroom where she had been successfully for five years and where she had seniority over the other paraprofessionals. Ms. Ellis noticed, however, that her name did not appear on any teacher assignment list. After the meeting was over, Principal McQuade pulled Ms. Ellis aside and told her that she had transferred Ms. Ellis to the seventh grade. Serving as a Special Needs Teacher Aide in the seventh grade was a much more demanding position than she had held before. She was assigned to assist 13 seventh grade students on IEPs instead of the one to four students that she had been assigned to in Mr. Drosdek's classroom. She had never taught 7th grade before. She worked with students in two science classes, two social studies classes, a math class and an arts class. She had to learn an entirely new curriculum.

16. Ms. Ellis was never told why Principal McQuade transferred her to seventh grade. At the time, she had the second highest level of seniority among the paraprofessionals in the North Andover Middle School. The position with Mr. Drosdek was still available and was filled by a paraprofessional with less seniority than Ms. Ellis, who in fact was a new hire in the Middle School.

17. In September 2015, Ms. Ellis was evaluated by Jeffrey Marx, an ophthalmologist, for proliferative diabetic retinopathy. On September 15, 2015, Dr. Marx wrote a letter To Whom It May Concern, indicating that, among other things, Ms. Ellis would have a low vision re-evaluation on September 21, 2015. Ms. Ellis provided the letter to Principal McQuade. **A copy of Dr. Mark's letter is attached as Attachment 1-Exhibit A.**

18. After Ms. Ellis completed her low vision evaluation on September 21, 2015, she provided a letter to Principal McQuade from her evaluator that recommended she use large print materials, good lighting, including goose neck lamps or task lights, and writing or reading guides such as a black ruler. The evaluation also recommended ZoomText on her computer at work. **A copy of the low vision evaluation letter is attached as Attachment 1-Exhibit B**.

19. After providing Dr. Marx's letter and the letter from her low-vision evaluator to Principal McQuade, Defendant never engaged in the interactive process. Ms. Ellis only had one informal discussion with Principal McQuade where she suggested that Ms. Ellis take a ruler and draw a black line in marker under the ruler. This discussion took place in a seventh grade hallway in front of students. Principal McQuade did not agree to provide any of the accommodations recommended by the low-vision evaluator.

20. Ms. Ellis felt that Principal McQuade had intentionally placed her in the more demanding position in order to make her job more difficult and ultimately to either encourage her to resign or to be able to terminate her for not being able to do her job.

21. In October 2015, Ms. Ellis developed a fracture in her left foot, which revealed that she had a diabetic condition known as Charcot arthropathy of her foot, which is a weakening of the bones and if untreated can have serious consequences leading to deformity of the foot and in some cases amputation. Her doctor recommended a medical leave as treatment included complete immobilization of the foot so that the bones can heal, a process that can take many months. Ms. Ellis provided documentation of her condition to Principal McQuade. She was on a paid medical leave of absence from October 13, 2015 through May 20, 2016 and was then on unpaid medical leave through the end of June 2016. During her medical leave, she provided updates on her condition on November 2, 2015, December 21, 2015, January 26, 2016, and April 7, 2016. On May 3, 2016, Ms. Ellis's doctor provided a letter to the school district indicating that Ms. Ellis would need to remain on medical leave from work for the remainder of the 2015-16 school year, and that she "should be able to return to the workplace at the beginning of the school term and fall 2016." **A copy of Ms. Ellis's doctor's letter is attached as Attachment 1-Exhibit C**. Ms. Ellis mailed this letter to Principal McQuade at the Middle School.

22. No one from the school district contacted Ms. Ellis after May 3, 2016, to discuss her medical condition or her return to work for the 2016-17 school year.

23. On or about June 1, 2016, Ms. Ellis received a letter from Principal McQuade and signed by Dr. Jennifer Price, Superintendent of the North Andover Public Schools, informing her that she would not be reappointed for the 2016-17 school year, and that her last day of

work would be June 22, 2016. **A copy of the termination letter is attached as Attachment 1-Exhibit D**.

24. On June 4, 2016, after receiving Dr. Price's letter, Ms. Ellis contacted Principal McQuade by e-mail and requested a meeting to discuss the letter and her desire to return to work in September.

25. On June 16, 2016, Ms. Ellis's doctor provided a letter indicating that Ms. Ellis could return to light duty work "immediately" with some restrictions: she was not to stand for more than 10 minutes without a break, she should not walk more than 500 feet without a break, and should use an ambulatory aid if necessary. She was not to push, pull, carry or lift more than 5 pounds. The letter indicated that the restrictions were related to Charcot arthropathy of bilateral feet. **A copy of the June 16, 2016 doctor's letter is attached as Attachment 1-Exhibit E**. Ms. Ellis provided this letter to Principal McQuade.

26. At that time, Ms. Ellis's vision issues did not prevent her from working. She would have needed the same accommodations for her vision impairment that she requested in the fall of 2015. As for her foot issues, her foot was in a cast and had healed enough that she was able to wear a boot and ambulate, though she could not walk long distances. She was also able to drive.

27. NAPS scheduled the meeting with Ms. Ellis, her union representatives, and Administrators from NAPS, for June 22, 2016, the last day of the 2015-16 school year.

28. Ms. Ellis belonged to a union, the North Andover Professional Support Association (NAPSA). On June 22, 2016, Ryan Landry, President of the union, Tedi Winkler a liaison to the union from the Massachusetts Teachers Association (MTA), Assistant Superintendent Jim Mealey, Middle School Principal Joan McQuade, and Ms. Ellis met

to discuss her situation. At that meeting, the school Administrators said that Ms. Ellis had been terminated because of changes in the Special Education program that resulted in a need for fewer paraprofessionals in the Middle School. In the course of the meeting, the school Administrators also asserted that Ms. Ellis was terminated because she had requested that students in her classroom at the Middle School use pen instead of pencil, because pen was easier for her to see.  Ms. Ellis denied having made that request.  She did say, however, that she had trouble reading light pencil, and that the accommodations outlined in her doctors' letter from September 2015 would help her with her vision.  Ms. Ellis provided a second copy of the September 2015 requests for accommodations to the meeting attendees.  Ms. Ellis and her union representatives asked that the Defendant rescind the termination notice.

29. During the June 22, 2016 meeting, Ms. Ellis and her union representatives also requested accommodations to her foot condition that would allow her to return to work in the Fall. She asked that she not have to stand for more than 10 minutes without a break, or walk more than 500 feet without a break, and use an ambulatory device, including a wheelchair, as necessary. She asked to be able to store a wheel chair in the school. Although Ms. Ellis was able to walk short distances, the wheelchair would help her to get from her classroom to other rooms at a distance away from her classroom.  She asked to use a handicap parking space that was close to an entrance to the building.  Defendant never responded to these requests and never engaged in the interactive process around these requests.  Defendant never claimed that any of these requests would impose an undue hardship.

30. In the June 22, 2016 meeting, Ms. Ellis requested that she be returned to Mr. Drosdek's classroom. Principal McQuade denied Ms. Ellis's request, telling her that they had eliminated the multi-classroom program in connection with changes in the Special Education program. Principal McQuade told Ms. Ellis that there were no positions available for her in the North Andover Middle School. Principal McQuade and Asst. Supt. Mealey said that Ms. Ellis might be able to return to work at a different school, however, they did not offer Ms. Ellis a position. The meeting ended with Ms. Ellis's situation left unresolved.

31. Under the collective bargaining agreement in place in 2016, if a member's position is eliminated, but the member is not laid off, "that member is guaranteed a position equivalent to his/her current FTE based on seniority." Agreement between the North Andover School Committee and the North Andover Professional Support Association (2014-2017), Article V, Section 4. Where Defendant told Ms. Ellis in the June 22 meeting that it did not renew her employment due to changes in the Special Education program, she should have been provided with an equivalent position based on her seniority. Ms. Ellis, who had been hired in 2000, was one of the most senior paraprofessionals in the school district.

32. Some time after the June 22, 2016 meeting, Ms. Ellis learned that Mr. Drosdek, who continued to teach special education students at the North Andover Middle School, continued to have paraprofessionals assigned to work with him. Ms. Ellis had at least as much if not more seniority than the paraprofessionals assigned to Mr. Drosdek, and could have performed that job.

33. It was common in the North Andover Public Schools to move teaching assistants like Ms. Ellis into a new position if their old position was no longer needed. Teaching Assistants did not have to apply to be placed in a new position. NAPS would simply place them in a new position. Therefore, both according to the collective bargaining agreement and according to practice at NAPS, Ms. Ellis should not have had to apply for a new position. For this reason, Ms. Ellis expected to be offered a position and was waiting for NAPS to do so.

34. In communications with Tedi Winkler of the MTA sometime after the June 22nd meeting, Asst. Supt. Mealey conditioned any potential return to work by Ms. Ellis on an examination by the school district's physician to determine her capacity to return to work.

35. Information became available to Ms. Ellis in mid-July that the district's doctor who would perform the return to work exam was a pediatrician. Ms. Ellis was not comfortable subjecting herself to an exam by a doctor whose expertise was in pediatrics, a specialty unrelated to her diabetic related medical conditions, Charcot arthropathy of bilateral feet and proliferative diabetic retinopathy.

36. Ms. Winkler followed up with Asst. Supt. Mealey about the requirement for the medical exam in mid-August 2016. In an e-mail to Ms. Winkler dated August 15, 2016, Asst. Supt. Mealey expressed a willingness to modify the requirement so that "a General Practitioner with experience conducting workplace evaluations" instead of a pediatrician would conduct the exam. **A copy of Mr. Mealey's email is attached as Attachment 1-Exhibit F**. Ms. Ellis still was not comfortable subjecting herself to an exam by a General Practitioner whose specialty involved workplace examinations, and who was not a specialist in either of her diabetic-related medical conditions.

37. The August 15, 2016 email also stated that the doctor was meant to determine whether Ms. Ellis could return to work "without restrictions, or with reasonable accommodations." **Exhibit F**. Given that Defendant had not yet offered Ms. Ellis a position it was unclear how the doctor could determine whether she could perform the duties of an unknown position without restrictions or with reasonable accommodations.

38. Ms. Ellis's MTA union liaison Ms. Winkler continued to press NAPS to provide a doctor to perform the IME who was familiar with Ms. Ellis's medical condition, to no avail.

39. Defendant had no formal policy that employees have to undergo an IME in order to return to work. Ms. Ellis and her union representatives are not aware of any other paraprofessionals who were required to undergo an IME to return to work. The only policy Defendants have that is related is the NAPS FMLA policy, which only requires an employee to have a "fitness for duty" certification from their doctor to return from a medical leave. Ms. Ellis did obtain a fitness for duty letter from her doctor who stated in writing on June 16, 2016 that she could return to work "immediately."

40. Asst. Supt. Mealey's August 15, 2016 e-mail reveals what was in fact the real reason that Ms. Ellis's employment was terminated. In that email, Asst. Supt. Mealey indicated that Ms. Ellis's employment was terminated because of her "inability to perform the functions of the position." **Exhibit F.** This was the first indication that the real reason Ms. Ellis's employment had not been renewed was because of her disability or because of a perception that she was disabled and unable to perform her job.

41. At no time did Asst. Supt. Mealey or any other school district official make a job offer to Ms. Ellis for a specific position despite the fact that there were openings for jobs that Ms. Ellis could have performed. On August 25, 2016 and again on September 23, 2016, the

North Andover Public Schools posted openings for paraprofessionals at the Middle School. The job opening postings contradicted the assertions made by the school Administrators to Ms. Ellis and her union representative at the June 22, 2016 meeting that fewer paraprofessionals would be assigned to the Middle School because of changes in the Special Education program.

42. In the last three years, the number of paraprofessionals in the North Andover Public Schools has increased, not decreased.

43. Ms. Ellis believes that the North Andover Public Schools terminated her employment because of her diabetes and the health issues that she had encountered as a result of her diabetes.

44. As a result of the termination of her employment with the North Andover Public Schools, Ms. Ellis lost her salary from her position as a Special Education Teacher Aide, and also lost income she had earned in after-school programs and summer school programs administered by the North Andover Public Schools.

45. As a result of the termination of her employment with the North Andover Public Schools, Ms. Ellis has experienced significant anxiety, psychological distress, loss of confidence and self esteem, as well as harm to her professional reputation. Ms. Ellis loved working with special education students, and she feels that NAPS took her life's work away from her when they terminated her employment.

## COUNT I

**Discrimination on the Basis of Disability: Failure to Accommodate**
**Violation of the Americans with Disabilities Act and Mass. Gen. Law. c. 151B, § 4(16)**

46. Ms. Ellis repeats and realleges paragraphs 1 through 45 as though fully set forth herein.

47. Ms. Ellis is disabled as that term is defined in the ADA and Chapter 151B. She has impairments, namely she was diagnosed with diabetes as well as diabetes related medical conditions of Charcot arthropathy of bilateral feet and proliferative diabetic retinopathy. These medical conditions substantially limit major life activities including walking and seeing.

48. In September and October 2015 and then again on June 22, 2016, Ms. Ellis requested reasonable accommodations to her proliferative diabetic retinopathy in order to allow her to see better, providing notes from her doctor to support the requested accommodations. Defendant did not engage in the interactive process and did not provide the goose neck lamps or task lamps, or zoom text on a laptop, or the writing guide/reading guide. Defendant's only suggestion was that Ms. Ellis take a ruler and draw a black line under the ruler.

49. On June 22, 2016, Ms. Ellis requested as a reasonable accommodation to her Charcot arthropathy of bilateral feet that she be allowed to use a wheel chair, that she not have to stand for more than 10 minutes without a break, or walk more than 500 feet without a break, and use an ambulatory device, including a wheelchair, as necessary. She also asked to be able to store her wheel chair in the school. She also asked for a handicap parking space near the entrance door. Defendant never responded to these requests and never engaged in the interactive process around these requests.

50. Defendant will not be able to prove that providing the accommodations Plaintiff requested would constitute an undue hardship as none of the requests would have posed a significant financial burden to NAPS.

51. Defendant's failure to provide Plaintiff with a reasonable accommodation constitutes discrimination against her on the basis of her disability and is a failure to provide a reasonable accommodation, thereby violating the ADA, 42 U.S.C. § 12111 *et seq.*, and M.G.L. c. 151B, §4(16).

52. As a result of the conduct alleged, Ms. Ellis has suffered damages, including but not limited to loss of income and other benefits, emotional distress damages and attorneys' fees and costs.

**WHEREFORE**, Ms. Ellis prays this Court enter a judgment on Count I above against the Defendant North Andover Public Schools and award her compensatory damages (including lost wages and benefits, and damages for emotional distress), reasonable attorneys' fees, costs and interest, punitive damages, and such other relief as the Court deems just and proper.

## COUNT II

**Termination in Violation of the Americans with Disabilities Act
and Mass. Gen. Law. c. 151B**

53. Ms. Ellis realleges and incorporates by reference paragraphs 1 through 52 above.

54. Ms. Ellis was terminated by the Defendant because of her disability or because she was perceived as disabled. In the August 15, 2016 email, Asst. Supt. Mealey specifically states "Ms. Ellis's employment was terminated because of her "inability to perform the functions of the position." **Exhibit F.**

55. At the time the termination letter was written, Ms. Ellis was on an approved medical leave of absence.

56. Defendant failed to rescind its termination notice despite the fact that Plaintiff provided a letter from her doctor clearing her "immediately" to return to work.

57. Defendant never offered Ms. Ellis another position despite the fact that there were open paraprofessional teachers aide positions in the school district during the relevant time period.

58. Terminating Ms. Ellis and failing to offer her an available open position because of her disability or because she was perceived to be disabled constitutes disability discrimination in violation of the ADA, 42 U.S.C. § 12111 *et seq.*, and M.G.L. c. 151B, §4(16).

59. As a direct and proximate result of the above described conduct, Ms. Ellis has sustained substantial injury, including but not limited to, loss of compensation, emotional distress, attorneys' fees and costs.

**WHEREFORE**, Ms. Ellis requests that this Court enter a judgment on Count II ordering Defendant North Andover Public Schools pay to Ms. Ellis the following: compensatory damages including lost compensation and benefits and emotional distress damages, punitive damages, attorneys' fees, costs and interest, and such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all counts so triable.

          Respectfully Submitted,
          By Her Attorneys

          */s/ Justine H. Brousseau*
          Justine H. Brousseau   BBO# 553776
          Nina Joan Kimball      BBO# 547567
          Kimball Brousseau LLP
          One Washington Mall, 7th Floor
          Boston, MA  02108
          (617) 367-9449
          jbrousseau@kbattorneys.com
DATED: May 31, 2019      nkimball@kbattorneys.com